UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

HIPPO HOLDINGS INC. AND §
HIPPO ANALYTICS INC. §
 §
 §    ACTION NO. 4:25-cv-396-Y
v. §
 §
MARK K. MILLER §

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

Before the Court is defendant Mark K. Miller's motion (doc. 29) to dismiss plaintiffs' ("Hippo") amended complaint. After reviewing the motion, the parties' arguments, and the applicable law, the Court concludes that the motion should be granted for the reasons set out below.

**BACKGROUND[1]**

Mark K. Miller is the CEO of Goosehead Insurance, Inc. ("Goosehead"). In 2019, Goosehead entered a sub-producer agreement with plaintiffs Hippo Holdings, Inc. and Hippo Analytics, Inc. (collectively "Hippo"). Goosehead agreed to sell insurance policies through Hippo's online system in exchange for commissions on the premiums of these insurance policies. In 2023, Hippo reduced the commission rates, as permitted by the sub-producer agreement. Hippo claims that a series of mass-casualty events resulted in the need to reduce their exposure in Texas. Goosehead never formally

---

[1]The factual background is taken from Hippo's factual allegations as set out in the amended complaint (doc. 23). For the purposes of this order, the Court presumes that all well-pleaded factual allegations are true.

objected to this change. Instead, it continued to renew existing policies and accept commission payments. Despite this continuing relationship, Goosehead was unhappy with the commission reduction.

Mark Jones, then CEO of Goosehead, allegedly made some complaints to Hippo's CEO, Rick McCathron, following Hippo's first reduction in commission rates.[2] In 2024, Hippo reduced the commission rates again. Miller, now CEO of Goosehead, demanded that Hippo reinstate the previous commission rates. Goosehead and Hippo are currently arbitrating this dispute.

Prior to the 2024 commission revisions, Miller participated in an earnings call with Goosehead executives, investors, and several industry analysts. This call was broadcast publicly, and transcripts were released to the public. During the call, Miller stated:

> In addition, in Texas, there are a few large captive carriers who haven't raised rates as aggressively and are losing billions of dollars. . . . These losses are not sustainable . . . . In addition, two carriers who have been under extreme financial distress significantly lowered commission rates . . . . These are two carriers that . . . were financially distressed, they came to us and said, we are in a financial position where we need to back away. So, this was . . . HIPPO. They wanted to pull out of the market and they wanted to reduce commissions as a result of it.

---

[2] Notably, Hippo does not bring suit against Mark Jones, so the Court does not republish the statements allegedly made by Jones to McCathron. The only defendant in this suit is Miller, who is being sued for the public statements he made on the Earnings Call, not Jones's private statements to McCathron. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998) (requiring alleged defamation statements to be **published** by the defendant).

When asked to quantify the commission reduction, Miller responded, "I don't think we're going to get into the specifics on the rate, but it was enough for us to call it out."

Due to Miller's statements, Hippo alleges defamation, business disparagement, and unfair or deceptive acts under the Texas Insurance Code. Each cause of action arises from Miller's statements during the Earnings Call. Hippo claims that Miller made false statements with actual malice or knowledge of their falsity; these statements were "of and concerning" Hippo; and these statements caused Hippo monetary and reputational damages. With regards to the defamation claim, Hippo argues that they are not a limited-purpose public figure; therefore, they need only plead sufficient factual data to plausibly allege that Miller failed to exercise reasonable care in determining the truth or falsity of his statements before making them, rather than actual malice.

Miller moved to dismiss Hippo's initial complaint. Hippo filed an amended complaint. Miller now moves to dismiss Hippo's First Amended Complaint for failure to state claim for each cause of action. Plaintiffs filed a response, in which they raise an evidentiary objection, and Miller filed a reply. Miller's motion to dismiss is now ripe for the Court's review.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) authorizes a Court to dismiss an action when the complaint fails to "state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). Although the complaint is not required to have detailed factual allegations, the pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To defeat a 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept **legal conclusions** as true, and only a

complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79.

## ANALYSIS

A. Evidentiary Objection

Hippo attached only the Earnings Call transcript to support their first amended complaint (doc. 23, Ex. A). Miller's motion to dismiss requests judicial notice of five news articles describing Hippo's financial difficulties and excerpts of Hippo's SEC financial disclosures (doc. 29, pg. 4 n.3). Hippo objects to Miller's request for judicial notice on the grounds that the materials were not referenced in or attached to the first amended complaint (doc. 36, pg. 12).

A court may take judicial notice of a "fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Fifth Circuit ruled that Form 10-K filings are "publicly available governmental filings and the existence of the documents, and the contents therein, cannot reasonably be questioned." *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020). Miller seeks to introduce excerpts from Hippo's Form 10-K filing and the related Form 10-Q. These forms and the contents therein "fall squarely within the ambit Rule 201(b)." *Id.* Further, documents attached to a motion to dismiss "are considered part of

the pleadings if they are referred to in the plaintiff's complaint and are central to [their] claim." *Med RX/Systems, P.L.L.C. v. Texas Dept. of State Health Services*, 633 F.App'x 607, 610 (5th Cir. 2016). Hippo's amended complaint expressly references "SEC financial disclosures," which include Form 10-K and Form 10-Q filings (doc. 23, ¶ 41). According to Hipppo, these disclosures were publicly available; therefore, Miller knew of Hippo's financial stability, yet he disregarded this knowledge in making allegedly false statements to the contrary. Hippo references its SEC disclosures to establish actual malice, an essential element of their claims. The Court takes judicial notice of Plaintiffs' SEC filings because the accuracy of the filings "cannot be reasonably questioned," and the filings, as referenced, are central to Hippo's claims.

Hippo and Miller assert that courts may take judicial notice of publications only to show that certain information was in the public realm, not to prove the truth or falsity of this information. *See Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 960 (9th Cir. 2010). However, the Fifth Circuit has not employed this line of reasoning to take judicial notice. Miller's motion to dismiss requests judicial notice of five news articles (doc. 29, pg. 4 n.3). Miller uses these exhibits only to demonstrate a public interest in Plaintiffs' economic performance and establish Plaintiffs as a limited-purpose public figure. Given

the nature of large public insurance providers, the Earnings Call transcript, and the injury alleged, the Court does not need to consider these articles to deem Hippo a limited-purpose public figure; therefore, the Court declines to decide whether judicial notice of the five articles is warranted.

B. Defamation

The elements of a defamation claim are "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages." *Anderson v. Durant*, 550 S.W.3d 605, 617–18 (Tex. 2013).

"[A] defamatory statement is one that tends to injure a person's reputation." *Hancock v. Variyam*, 400 S.W.3d 59, 62 (Tex. 2013). These statements must be "reasonably capable of a defamatory meaning." *Id.* at 66. In making this determination, courts interpret the publication "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). "Truth is a complete defense to defamation." *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). "If a statement is not verifiable as false, it is not defamatory." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018). An opinion is not verifiable as false. *See Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 795 (Tex. 2019).

The requisite degree of fault for defamation is "acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). To establish actual malice, a plaintiff must prove that the speaker made the statement "with knowledge that it was false or with reckless disregard of whether it was true or not." *Huckabee v. Time Warner Ent. Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 1998). To establish reckless disregard, a plaintiff must prove that the speaker "entertained serious doubts as to the truth of his publication." *Id.*

i. Limited-Purpose Public Figure

A limited-purpose public figure "voluntarily engage[s] in a course that [is] bound to invite attention and comment." *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978). Hippo is a limited-purpose public figure if: (1) the controversy at issue is public, "both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;" (2) Hippo has "more than a trivial or tangential role in the controversy;" and (3) the alleged defamation is "germane to [Hippo's] participation in the controversy." *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433-434 (5th Cir. 1987).

Hippo argues that the controversy at issue is a private

business dispute, arising from the sub-producer agreement and the commission reduction. Hippo's argument misses the mark. This is a defamation dispute surrounding Miller's allegedly false statements regarding Hippo's financial performance within the greater insurance industry. The controversy at issue is the true status of Hippo's financial performance within that industry. Because Hippo is a large public insurance provider, this controversy is inherently public.

As a large publicly traded company, Hippo exposes itself to public discussion. Any member of the investing public has some modicum of interest in Hippo's financial performance. Hippo claims that it was "experiencing rapid growth in revenue by every conceivable metric." (Doc. 23 ¶ 55). If this were true, and the alleged defamatory statements were false, any competent investor, potential investor, and the investment media might not hesitate to buy Hippo stock, recommend that others do the same, or, at the very least, discuss Hippo's financial performance among industry experts.

This is not to say that all large publicly traded companies are limited-purpose public figures. Attention from the investing public alone does not settle the issue. Hippo is a large insurance carrier, specializing in homeowners' insurance, offering insurance products in all fifty states, and owning multiple subsidiaries. From 2018 to 2024, Hippo, "in Texas alone, placed or renewed over

ORDER GRANTING MOTION TO DISMISS – PAGE 9

tens of thousands of insurance policies," collecting "over $100 million in premiums." (Doc. 23 ¶ 20). Hippo is responsible for insuring their client's property when disaster strikes. And, as shown by the recent "series of mass-casualty events in Texas," disaster strikes all too often (doc. 23 ¶ 23). Hippo's clients are surely interested in whether their homes are protected, and as a result, these clients are likely discussing Hippo's financial performance. If the alleged defamatory statements were true, and Plaintiffs were financially distressed, many of Plaintiffs' clients could conceivably take drastic and risky measures to find a different insurance provider.

The transcript of the earnings call and the injury alleged further demonstrate the public nature of this controversy. Most participants in the call were industry analysts. While the call largely pertained to Goosehead's business, Goosehead's business performance is necessarily related to the performance of Hippo's business. Further, the mentioning of Hippo sparked a barrage of analyst-driven questions. These questions exhibit the investing public's interest in Hippo's financial performance due to the broader implications of this topic.

The earnings call was also broadcast and transcribed to the public. If discussion of Goosehead's financial performance generates enough attention to warrant this kind of publicity, then discussion of Hippo, a much larger insurance carrier, and its

financial performance must also ring in the public ear. Hippo claims that the statements in dispute resulted in extensive reputational damage, adversely affecting Hippo's ability to attract new investors and damaging relationships with consumers (doc. 23, ¶ 46). If Hippo did experience such widespread consequence of the alleged defamatory statements, then people are discussing this controversy and "people other than the immediate participants . . . are likely to feel the impact of its resolution." *See Trotter*, 818 F.2d at 433-434. The controversy at issue, Hippo's financial performance, is public.

Hippo has "more than a trivial or tangential role in the controversy." *See Trotter*, 818 F.2d at 433-434. Hippo is the subject of this controversy. It is Hippo's financial performance at issue. By publicly responding to the statements in dispute, Hippo has taken a direct and central role in this controversy (*see* doc. 23, ¶ 45).

Finally, the alleged defamation is "germane to [Hippo's] participation in the controversy." *See Trotter*, 818 F.2d at 433-434. Hippo is bringing this lawsuit to discredit and recover from the allegedly defamatory assertion that Hippo is financially distressed. Plaintiffs would not be involved in this controversy——in fact, there would be no controversy——if the alleged defamation did not occur.

The controversy at issue is the subject of the alleged

ORDER GRANTING MOTION TO DISMISS – PAGE 11

defamatory statements: Hippo's financial performance. As a large public insurance carrier, Hippo voluntarily subjects their financial performance to public "attention and comment." *See Rosanova*, 580 F.2d at 861. This controversy passes each step of the *Trotter* test; therefore, for the purpose of this dispute, Hippo is a limited-purpose public figure. *See Trotter*, 818 F.2d at 433-434. Hippo must show that Miller made the allegedly defamatory statements with actual malice. *See WFAA-TV*, 978 S.W.2d at 571.

ii. Statements not Concerning Plaintiffs

Hippo relies on the proximity between Miller's initial reference to Hippo and the allegedly defamatory statements regarding "large captive carriers" to conclude that these statements concerned Hippo; however, Plaintiffs ignore the substance of these statements and the context in which they were made (*see* doc. 36, pg. 18).

Miller made the statements "losing billions of dollars" and "[t]hese losses are not sustainable" to describe "large captive carriers" when listing three categories of insurance carriers with distinct commission structures. Doc. 23, Ex. A pg. 7. Miller first described "carriers [who] have taken aggressive price increases," then "a few large captive carriers who haven't raised rates as aggressively," and finally, "two carriers who have . . . significantly lowered commission rates." *Id.* The phrase "carriers who haven't raised rates as aggressively" implies that these

carriers have raised rates. *See id.* Conversely, the phrase "two carriers who have . . . significantly lowered commission rates" cannot reasonably refer to a carrier that has raised rates and vice versa. *See id.* Further, each category of carrier is separated by the phrase "in addition." *Id.* In some contexts, "in addition" marks the transition between related points; however, here, due to the distinct and conflicting descriptions of commission structures, "in addition" serves as an impermeable partition between list items, each independent from the next. *See id.*

Miller first stated, "there are a few large captive carriers who haven't raised rates as aggressively and are losing billions of dollars. These losses are not sustainable." *Id.* Moving to the next list item, Miller referenced Hippo, stating, "In addition, two carriers who have been under extreme financial distress significantly lowered commission rates." *Id.* When discussing Hippo's commission structure, Miller never described Hippo as anything other than a carrier who had lowered rates. Although close in proximity, Miller's reference to Hippo, in both context and substance, is distinct from his description of "a few large captive carriers who haven't raised rates as aggressively." *See id.* Even if Hippo is commonly described as "a large captive carrier," Miller distinguished Hippo from these carriers——who are "losing billions of dollars" and experiencing "losses [that] are not sustainable" ——using qualifiers based on markedly different commission

ORDER GRANTING MOTION TO DISMISS – PAGE 13

structures. *See id.*

"Based upon how a person of ordinary intelligence would perceive it," the statements "losing billions of dollars" and "[t]hese losses are not sustainable" do not concern Hippo. *See id.; Turner*, 38 S.W.3d at 114. Hippo merely alleges that these statements were "concerning Hippo's financial condition and business" because Hippo is a "large captive carrier" mentioned shortly after these statements were made (doc. 23, ¶ 51). Hippo does not rebut the clear distinction between Hippo——who **lowered** commission rates——and the "carriers who haven't raised rates as aggressively." Doc. 23, Ex. A pg. 7.

Accordingly, Hippo fails to plausibly allege that the statements "losing billions of dollars" and "[t]hese losses are not sustainable" are "reasonably capable of a defamatory meaning" towards Hippo. *See id.; Hancock*, 400 S.W.3d at 62.

iii. Actual Malice

Hippo does not plead facts to plausibly support their claim that Miller made the alleged defamatory statements with knowledge of their falsity or serious doubt as to their truth. *Huckabee*, 19 S.W.3d at 420. Hippo makes conclusory allegations to support the element of actual malice, such as Miller "must have known . . . Hippo was a rapidly growing insurance group." (Doc. 23, ¶ 55). At the motion-to-dismiss stage, the Court must disregard these allegations. Accordingly, Plaintiffs fail to state a claim for

ORDER GRANTING MOTION TO DISMISS – PAGE 14

actual malice. Therefore, their defamation claim must fail, as Hippo is a limited-purpose public figure. The defamation claim is DISMISSED with prejudice.

C. Business-Disparagement and Texas Insurance Code Claims

Because the business-disparagement claim and the Texas Insurance Code claims rest on the defamation claim, these claims fail as a matter of law because Plaintiffs have failed to state a claim for defamation under Federal Rule of Civil Procedure 12(b)(6). These claims are DISMISSED with prejudice.

**CONCLUSION**

Having considered Miller's motion and the applicable law, the Court concludes that it should be and is hereby **GRANTED** for the reasons set out above. Hippo's claims are **DISMISSED with prejudice.** A final judgment will issue separately.

SIGNED April 22, 2026.

_Terry R. Means_

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE